## King et al. v. Kitchen's Ex'rs et al.

(Decided March 22, 1938.)

158

J. J. McBRAYER and W. E. DARRAGH for appellants.

GEORGE B. MARTIN, W. H. DYSARD, DYSARD & TINSLEY, MARTIN & SMITH for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

Charles Kitchen, Sr., a citizen and resident of Carter county, died testate in the latter part of 1923. After

his will had been duly probated in the county court of that county, James H. Kitchen, John W. Kitchen, and Charles J. Kitchen, Jr., who were nominated as .executors therein, were duly appointed and qualified as such. Charles J. Kitchen, Jr., thereafter died, and the other two executors continued to administer the affairs of the estate. In fact, after his appointment, Charles J. Kitchen, Jr., because of ill health and absence from the state, left the management of the estate practically altogether to the other two executors. The testator was survived by nine children by his first marriage. It appears in the record that he had children by a second marriage, but as indicated in the will and from the record, he made provision for them prior to the execution of his will, and therefore they were given nothing under the will and are not parties to this litigation.

In December, 1930, Effie W. King, Lottie McBrayer, and Lulu B. King, daughters of testator, initiated this litigation by filing an equitable action against the executors and the three other daughters of testator who were devisees under the will for settlement and partition of testator's estate. After the issues were completed and evidence heard, the chancellor entered judgment directing the executors to make a full and complete settlement. On appeal to this court the judgment was affirmed by an opinion reported in 255 Ky. 235, 73 S. W. (2d) 45. The will of testator is set forth at length in that opinion. Without entering into unnecessary detail concerning steps subsequent to filing of the mandate in the lower court, it is sufficient to say that the executors, pursuant to the judgment as affirmed, made settlement, to which plaintiffs filed a large number of exceptions. The cause was then referred to a commissioner, who after hearing evidence made an extensive report, and from the judgment on exceptions to the settlement, the plaintiffs have appealed and defendants have on their motion been granted a cross-appeal.

We shall endeavor to take up and dispose of appellants' exceptions in the order in which they are discussed in their brief. They withdrew many of their exceptions, and we shall attempt to deal only with exceptions not withdrawn without regard to those withdrawn but to some of which reference apparently is made in briefs.

Exception first, E to K, inclusive, relates to pur-

chase of stocks by the executors with funds of the estate. Appellants sought to have the executors charged with the difference between the sum of $39,218.53 paid for this stock and $14,004.87, the amount it was then worth, with interest on the full amount paid for the stock at 6 per cent. from the date of the purchase until final settlement, less dividends paid thereon and accounted for. These stocks according to the evidence were purchased by the executors on the recommendation of reputable bankers and brokers, but that was in the days just preceding the worst financial depression the world has ever known and when the stocks purchased were thought by best business minds to be good investments. The executors testified that they purchased this stock to distribute to two of their sisters, Mrs. Wright and Mrs. Clevenger, in final distribution of the estate, thinking that they would make good investments for them.

As recommended by the commissioner and confirmed by the chancellor, the executors are required in effect to account for the full sum invested in the stocks, but are not required to account for any interest thereon save such as they received by way of dividends on the stock. The commissioner reasoned that if the investment had not been made and the money permitted to remain in the bank only 2 per cent. would have been received thereon, and since the dividends received on the stock and accounted for by the executors amounted to more than 2 per cent. interest, the executors would not be required to make further accounting in that particular. It is a matter of proof as well as common knowledge that since these investments were made it has been difficult if not impossible to find safe investments that would yield anything like 6 per cent. interest; but it is argued by counsel for appellants that instead of making these investments the funds invested therein should have been distributed to the devisees. In this connection we might say with reference to appellees' exception to the judgment concerning the charge against them growing out of the stock transaction, that it is the contention of appellees that the executors were authorized by the will to make such investments and that having acted in the utmost good faith and in the exercise of their best judgment, after consulting with brokers and bankers, they should not

be charged with any loss sustained. We would be inclined to sustain this contention if we could read out of the will with certainty authority for making such investments. If distribution of the sums invested had been made so as to equalize the heirs at the time, appellants would have received little if anything from such distribution. As will presently appear in disposing of other exceptions, we are inclined to the view that the executors should not be charged with interest on all balances that were in their hands after the expiration of two years in excess of that which they received. It is also argued by counsel for appellants that the executors should be charged with legal interest on the sums invested in these stocks because they were made out to them individually and not in their fiduciary capacity, and the case of Pedigo v. Pedigo's Committee, 247 Ky. 403, 57 S. W. (2d) 54, and other authorities to the same effect are cited. The evidence clearly discloses that these investments were not made for the benefit of the executors individually but the stocks were made out to them individually merely as a matter of convenience in making transfers. They were held as assets of the estate; as shown by their accounts the dividends derived from them went into the account of the executors. It is apparent that the executors acted in the utmost good faith and not with any purpose of personal gain or emolument. In the circumstances shown it is obvious that the authorities cited have no application. It is our conclusion that the chancellor's finding concerning the matter of interest is correct, and while the contention of the executors with respect to the charge against them is not altogether without merit, we are not inclined to disturb the judgment in that particular.

Exception first C is referred to as the Kitchen Lumber Company claim. This company was incorporated in 1906 with a capital stock of $100,000. The original stockholders were Charles Kitchen, Sr., J. H. Kitchen, John W. Kitchen, and R. H. Vansant, each of whom took $25,000 of the stock. This company acquired very large areas of timber in North Carolina and possibly other states. The operation of the company required capital largely in excess of that paid in by the stockholders, so from time to time, under an agreement between themselves, they paid large sums which were treated as surplus and with the understanding that they

would be repaid out of the earnings of the company when conditions justified a disbursement and that no interest was to be charged on these advancements. The following sums were so advanced by the various stockholders: Charles Kitchen, Sr., $97,176.56; R. H. Vansant, $34,668.13; John W. Kitchen, $95,681.83; and James H. Kitchen, $92,675.32. Charles Kitchen, Sr., finally transferred his stock in the company to Charles Kitchen, Jr. $20,000 of the sum advanced by Charles Kitchen, Sr., was charged to Charles Kitchen, Jr., as an advancement in October, 1923, and later the executors collected from the company $50,000, leaving a balance of $27,176.56 which Charles Kitchen, Sr., had advanced to the Kitchen Lumber Company, and this sum has been charged to the estate of Charles Kitchen, Jr. The sums advanced by the executors to this company have been fully repaid. It is said in the commissioner's report that the only question about the $27,176.56 is whether it is owing and payable to the executors or whether it is owing to the estate of Charles Kitchen, Jr., and by his estate to the executors and should be charged to him; but further on in the report it is shown that it has been charged to his estate and this is not denied; and that the other question is an item of $58,-145.70, which appellants claim is due as interest on sums advanced by Charles Kitchen, Sr., to the company. Under the commissioner's report as confirmed by the chancellor this exception was overruled and it was adjudged that the Kitchen Lumber Company pay to the executors the balance of the advancement made by Charles Kitchen, Sr., and that they be charged with that amount when and if it is paid. The parties are all acquainted with the history and management of the Kitchen Lumber Company as revealed by the record, and it would serve no good purpose to encumber an opinion with a recital of these matters. We deem it sufficient to say that under the provisions of the will the executors were invested with a broad discretion in the management and settlement of the estate, and the record clearly reveals that the affairs of the Kitchen Lumber Company have been administered by them to the advantage of all parties concerned. In this connection it might appropriately be said in charging the balance of the advancement made by testator to the Kitchen Lumber Company to the account of Charles J. Kitchen, Jr., in the distribution shows an overpay-

ment of approximately $11,000 in favor of his estate, and some complaint is made about this overpayment; but as shown by the report of the commissioner, when final distribution is made in conformity with the commissioner's finding as confirmed by the court and the accounts adjusted, there will be no overpayment to the estate of Charles Kitchen, Jr.

From the evidence as a whole relating to the agreement and understanding between the stockholders of the Kitchen Lumber Company and the manner in which it was operated and administered by the executors after the death of the testator, it is our conclusion that the commissioner's report and the judgment in these particulars were correct and should not be disturbed.

Exception first D relates to what is called "the trust fund of 1910." It appears that about 1910 and thereafter, for reasons unnecessary to disclose but about which there is no question, testator turned over to his son James H. Kitchen large sums by way of stocks, bonds, certificates of deposit, etc. This exception sought to surcharge the executors' settlement with large sums representing the balance on the principal alleged not to have been accounted for and for interest. The evidence bears out the contention of appellees that all of the principal of this trust fund has been accounted for by James H. Kitchen. The evidence further shows that he has accounted for all interest, dividends, etc., that he has received from the trust fund; but it is claimed by appellants that he should be charged with the difference between the legal interest on the trust fund and the sum which he received and reported as dividends and interest, amounting to several thousand dollars. The evidence shows that testator was an officer of the Second National Bank of Ashland and owned a large portion of its stock. He kept large sums on deposit and under a special agreement was paid 2 per cent. interest. When the certificates of deposit were turned over by him to his son James H. Kitchen, these deposits were permitted to remain in the bank under the same agreement. The evidence reveals that the Kitchen estate owned the larger portion of the stock in that bank. The evidence of the executors and others reveals the great difficulties under which the bank labored to avoid suspension and how the withdrawal of large sums might and likely would have brought on disaster. The interest of John W. Kitchen and James H. Kitchen in the wel-

fare of this bank is evidenced by the fact that at one time during the depression, they borrowed $250,000 on their own collateral to maintain a proper reserve. Whatever they did to save this bank from dissolution operated to the benefit of the other heirs as well as to themselves. Under the evidence relating to the management of this trust fund we unhesitatingly hold that the judgment in this particular is correct.

Exception first A relates to interest on bank balances carried by the executors. The executors were paid 2 per cent. interest on their bank balances under the same arrangement that their father had with the bank. It is claimed by appellants that they should be charged with the difference between interest thus received and legal interest amounting to something over $14,000. It is true that section 3859, Kentucky Statutes, requires a personal representative after the expiration of two years from the date of his qualification to pay interest on surplus in his hands. The commissioner figured the balances by quarterly periods and deducted from such balances the commission due the executors and thus arrived at the amount which he considered surplus and found that the 2 per cent. received on the entire balance amounted to more than 6 per cent. on the surplus thus figured by him and therefore recommended that this exception be overruled, which was done. While the commissioner's finding is apparently sound, the judgment concerning this item may be sustained on other grounds. This was a large estate and, because of holdings in banks and other business enterprises, was complicated, and as already indicated, the executors were given a wide discretion in the matter of its management and settlement. It is quite apparent that if the executors had attempted to wind up the estate and make a settlement at the end of two years, it would have resulted in sacrifice and loss. It was necessary that they should carry considerable bank balances to take care of expenses and other matters in the administration of the estate, and in looking over the balances as revealed by the record, it does not appear to us that at any time they carried more than was reasonable or might be necessary for the purposes indicated.

Exceptions called in question failure of the chancellor to charge the executors with interest on all assets of the estate in their hands, and exceptions were also

filed to the supplemental and amended report of the commissioner filed on September 21, 1923, because interest was not charged on items reported therein. We find, however, that some of these items in the supplemental report as well as some of the other assets of the estate were covered by other exceptions. For reasons, some of which we have already assigned and some which will presently appear, we are not inclined to disturb the judgment relating to questions of interest raised by these exceptions.

Exception first B relates to certain real estate owned by testator and which had been held and managed by the executors from the date of their appointment. It is the contention of appellants that the executors should be surcharged with the value of this property as of 1925 with 6 per cent. per annum from that time, less the income derived from the real estate and that they should not be allowed credit for sums expended in the way of improvements and operating expenses. The real estate referred to in this exception is a farm of about 700 acres in Carter county and some city property in Ashland. It is shown by the evidence that at the time of the testator's death the farm had grown up and the fences and buildings were in bad state of repair. The executors continued the farm operations but expended sums in the improvement of the farm and bought livestock to feed or graze thereon. They accounted for income from all of these properties, and while they were not very remunerative, the evidence for the executors indicates that it was to the best interest not to throw this real estate on the market since it would have to be sold at a sacrifice. The will of testator clearly contemplated that the property should be handled by the executors to the best interests of the estate and that they should not be required to immediately dispose of it at such price as they might be offered, regardless of their judgment as to the value of the property. As disclosed by the record the executors were men of good business judgment and worthy of the confidence their father reposed in them. From the evidence concerning the real estate and its management it cannot be said that they failed in their duty or did not act for the best interest of the estate.

In 1911 testator purchased a large farm in Fayette county, for which he paid approximately $63,000, taking title thereto in the name of James H. Kitchen. Excep-

tion seventh A relates to the income from this farm while it was held and managed by James H. Kitchen, it being claimed that he has not accounted for such income; but the evidence indicates otherwise. This farm has been conveyed to Mrs. Effie King and charged to her in the settlement of the estate at $60,000. There is in the record evidence of a settlement between testator and James H. Kitchen covering the period the latter operated the Fayette county farm and a receipt signed by the testator showing that James H. Kitchen had accounted for all sums owing to the testator in transactions between them except a sum which was charged to James H. Kitchen as an advancement. It is therefore manifest that the exception was properly overruled.

Other exceptions of appellants to the commissioner's report and judgment involve matters of attorney's fees, executors' commissions, and costs. Appellees also make complaint about the judgment respecting the same matters, but a comprehensive view of the evidence concerning the services rendered to the estate by the executors, the litigants, and their respective attorneys manifests that the court has apparently dealt fairly and equitably with all parties concerned in the adjustment of these matters.

One of the storm centers of this litigation is what is known as the Parsons-Faulkner lot in Ashland, which testator conveyed to Mrs. McBrayer and Mrs. Lulu King. The commissioner recommended that Mrs. McBrayer and Mrs. King be charged with $10,000 each for this property in the settlement and distribution of the estate. The evidence shows without contradiction that testator kept a book in which he entered advancements made to his different children. This lot was charged to Mrs. King and Mrs. McBrayer at $10,000 each in that book. But it is the contention of appellees, and there is evidence to support the contention, that this was only a tentative charge and that testator intended to change it and charge them with a greater sum on account of the lot. The lot was first deeded to James H. Kitchen as trustee and later at the direction of testator he conveyed it to Mrs. McBrayer and Mrs. King. A great deal of the evidence concerns the date on which this deed was delivered and the value of the property at various times. The evidence shows beyond question that the lot is and has for many years been worth many times the amount charged against Mrs. McBrayer and Mrs. King.

While the evidence for appellees is of a strong and persuasive character the fact remains that the testator made no change in the amount charged as advancement in the book kept by him, and in view of the conflict in evidence, we would not be authorized to disturb the judgment on that account. Appellees also complain that Mrs. King and Mrs. McBrayer were not charged in the settlement for materials bought from a corporation owned by the heirs of testator to be used in the erection of a building on the Parsons-Faulkner lot. While the contention has some quality of merit, it is our view that the chancellor's finding regarding it should not be disturbed. However, by the last two items two of the appellants are distinctly favored in the distribution of the estate.

In summing up we may say that the litigants are acquainted with the evidence and the history of the case and a recitation of the hundreds of pages of evidence bearing on its various phases would be of no interest or value to others, but would extend an opinion beyond all reasonable proportions. The executors no doubt have erred in judgment in some matters but there is no evidence of corrupt motives, bad faith, or personal gain at the cost of other heirs on their part. On the other hand, it appears that they personally assumed financial risks to conserve the estate and in fact sustained personal loss in order to collect doubtful debts due it. They incurred loss of time and personal expense in securing an improved highway by testator's farm which had theretofore been isolated because of bad roads; and also in securing by payment of a nominal sum a compromise settlement of a suit, involving what was regarded as a dangerous claim for many thousands of dollars against one of the business enterprises in which the estate was largely interested. They asked no compensation for extra services but only for commission for distribution of assets, and the chancellor cut this down to what we would regard as the minimum for the services rendered.

While this court is not bound by the chancellor's findings of fact, but will for itself determine the effect of the weight of the evidence, it has consistently adhered to the rule that the chancellor's finding should not be disturbed when it is in harmony with the evidence, or where on the whole the mind is left in doubt concerning the correctness of the chancellor's conclu-

sions. Thompson v. Dulaney, 255 Ky. 794, 75 S. W. (2d) 524; Baker v. McIntosh, 244 Ky. 410, 51 S. W. (2d) 244; Calloway v. Howard, 247 Ky. 730, 57 S. W. (2d) 677. And the same rule applies to the report of a commissioner confirmed by the chancellor. Williams v. Denny, 238 Ky. 662, 38 S. W. (2d) 668; National Surety Corporation v. City of Bowling Green, 265 Ky. 36, 95 S. W. (2d) 1080. Under these established rules we would not in the circumstances revealed be authorized to disturb the chancellor's conclusions so far as findings of fact are concerned; and, notwithstanding some minor or technical irregularities, it is our conclusion that the judgment is in harmony with justice and equity.

Judgment affirmed.

Whole court sitting.